**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NICOLE RULLI, individually and on behalf of her minor son, A.F.; CHARLES BRYANT JR.; SIMON PHILLIPS; DONOVAN HAYDEN; JENNIFER "JAY" YODER; DONOVAN HAYDEN; and CHRISTOPHER WILSON JURING, individually and on behalf of all persons similarly situated, | ) ) ) ) ) ) ) ) | |
| | ) | CASE NO.  2:20-cv-965 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| CITY OF PITTSBURGH; WILLIAM PEDUTO, individually and in his official capacity as Mayor of the City of Pittsburgh; WENDELL HISSRICH, individually and in his official capacity as Director of Public Safety for the City of Pittsburgh; SCOTT SCHUBERT, individually and in his official capacity as Chief of the Pittsburgh Bureau of Police; STEPHEN VINANSKY, Commander of Zone 5 of the Pittsburgh Bureau of Police, in his individual capacity, JASON LANDO, Commander of Narcotics and Vice for the Pittsburgh Bureau of Police, in his individual capacity, JOHN DOE, Tactical Commander, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT IN CIVIL ACTION

I)     INTRODUCTION

    1.     Following the murder of George Floyd, a Black man, by Minneapolis, MN

police officers on May 25, 2020, a wave of sustained, large-scale demonstrations against

racism and racialized police violence swept across the United States and spread

throughout many parts of the world. Protesters expressed their outrage and called for

justice not only for George Floyd's murder, but also for Breonna Taylor, Tony McDade, and numerous other Black people, indigenous people, and people of color killed by police in the United States. Protesters have also called for changes to address systemic racism and reshape the way matters of public safety are addressed in this country and in their communities.

2.      On June 1, 2020, people from Pittsburgh and surrounding communities assembled in the East Liberty neighborhood of the City of Pittsburgh to add their voices to these nationwide protests and seek change locally. The Pittsburgh Bureau of Police ("PBP") responded by escalating a peaceful protest into a scene of pandemonium, panic, violence and bloodshed. The PBP deployed hundreds of officers to counter approximately 150 protesters.  As the assembled protesters held their hands in the air and chanted, "This is not a riot," and "Hands up – Don't shoot," PBP ordered its officers to attack them with explosives, chemical agents and ammunition which is known to seriously wound and sometimes kill its targets.  PBP officers drove ambulances past injured protesters without stopping. After ordering peaceful protesters to leave the area, PBP officers blocked their escape with chemical gas, riot police and mounted patrols. PBP then arrested several protestors for failing to disperse, subjecting them to confinement in the midst of a global COVID-19 pandemic.  The PBP ordered tactical officers dressed in paramilitary garb to patrol a residential neighborhood in armored vehicles and arbitrarily throw canisters of chemical gas at and/or arrest anyone they encountered.

3.      Plaintiffs assembled in East Liberty to protest the routine covering up of police misconduct and abuse. In response, City of Pittsburgh officials, including the Mayor, Public Safety Director and Chief of Police, disseminated flagrant lies to conceal

and/or justify the PBP's shameless use of force against peaceful protesters. These officials accused protesters of hurling rocks and "volleys of bricks" at PBP officers, and vehemently denied using chemical agents.   Numerous videos demonstrate that these statements were patently false.

      4.     Plaintiffs are peaceful protesters who were subjected to police violence while protesting police violence.

- Nicole Rulli and Charles Bryant brought Ms. Rulli's thirteen-year-old son, A.F., to the protest to teach him about his First Amendment rights.  The police gassed his family and taught him to fear political protests.

- Simon Phillips is a dance instructor who attended the protest for "the chance to congregate with others"  and express his "feelings of grief, frustration, and desperation for the Black community."  He was arrested near his East Liberty apartment after he complied with the PBP's order to leave.

- Donovan Hayden does public service work for a local non-profit.  He attended the protest to oppose the "degrading, reckless and racist policing" which he and other Black people experience on a daily basis.  PBP officers gassed him chased him a gunpoint as he left the protest.

- Jennifer "Jay" Yoder has a background in social justice and is a trained peacemaker. Yoder attended the protest to support the movement and aid other protesters.  Police gassed and pushed Yoder and arrested them[1] as they attempted to return to their car after the protest.

- Christopher Wilson Juring is a food service worker. He attended to protest violence and racism and to show support for the African American community.  PBP shot him in the back as he fled a cloud of tear gas and smoke.

      5.     Plaintiffs bring this class action on behalf of themselves and others similarly situated. Plaintiffs allege that the Defendants' conduct violated their First Amendment rights to freedom of speech and assembly, their Fourth Amendment rights to be free from

---

[1] Yoder uses the pronouns "they" and "them."

3

excessive force and false arrest and their Fourteenth Amendment right not to be subject to official governmental policies which violate their constitutional rights.

II)   PARTIES

6.   Plaintiff Nicole Rulli is an adult resident of the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania. She files this lawsuit on her own behalf and on behalf of her minor son A.F..

7.   Plaintiff Charles Bryant, Jr. is an adult resident of the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania.

8.   Plaintiff Simon Phillips is an adult resident of the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania.

9.   Plaintiff Jennifer "Jay" Yoder is an adult resident of the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania.

10.   Plaintiff Donovan Hayden is an adult resident of the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania.

11.   Plaintiff Christopher Wilson Juring is an adult resident of the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania.

12.   Defendant City of Pittsburgh is a municipality within the Commonwealth of Pennsylvania with a principal place of business located at 414 Grant Street, Pittsburgh, Pennsylvania 15219.  At all times relevant hereto, this Defendant was authorized to and did operate and maintain the Pittsburgh Bureau of Police ("PBP").  At all relevant times this Defendant acted by and through its duly authorized agents, employees and/or assigns, who were then and there acting within the course and scope of their employment,

under the color of state law and in accordance with the customs, policies and practices of the City of Pittsburgh.

13.     Defendant William Peduto is the Mayor of the City of Pittsburgh.  At all times relevant, Peduto was the chief policymaker of Defendant City of Pittsburgh. At all times relevant, Peduto ordered, authorized and/or acquiesced in the violations of Plaintiffs' rights as alleged herein. At all times relevant, Peduto was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Peduto is sued in his official and individual capacities.

14.     Defendant Wendell Hissrich is the Director of the City of Pittsburgh Department of Public Safety.  Hissrich is the chief policymaker for the City of Pittsburgh Department of Public Safety.   At all times relevant, Hissrich ordered, authorized, participated in and/or acquiesced in the violations of Plaintiffs' rights as alleged herein. At all times relevant, Hissrich was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Hissrich is sued in his official and individual capacities.

15.     Defendant Scott Schubert is the Chief of the Pittsburgh Bureau of Police. At all times relevant, Schubert was a policymaker of Defendant City of Pittsburgh. At all times relevant, Schubert ordered, authorized, participated in and/or acquiesced in the violations of Plaintiffs' rights as alleged herein. At all times relevant, Schubert was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Schubert is sued in his official and individual capacities.

16.     Defendant Stephen Vinansky is the Commander of Zone 5 of the Pittsburgh Bureau of Police. At all times relevant, Vinansky ordered, authorized, participated in, and/or acquiesced in the violations of Plaintiffs' rights as alleged herein. At all times relevant, Vinansky was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Vinaski is sued in his individual capacity.

17.     Defendant Jason Lando is the Commander of Narcotics and Vice for the Pittsburgh Bureau of Police. At all times relevant, Lando ordered, authorized, participated in, and/or acquiesced in the violations of Plaintiffs' rights as alleged herein. At all times relevant, Lando was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Lando is sued in his individual capacity.

18.     Defendant John Doe was the Tactical Commander of Pittsburgh Bureau of Police Special Weapons and Tactics (SWAT) Unit during the events described herein.  At all times relevant, Doe ordered, authorized, participated in, and/or acquiesced in the violations of Plaintiffs' rights as alleged herein. At all times relevant, Doe was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Defendant Doe is sued in his individual capacity.

III)     <u>JURISDICTION</u>

19.     The jurisdiction of this Court is invoked pursuant to 28 USC §§ 451, 1331, 1343 and 1345, and upon the doctrine of pendant and/or supplemental jurisdiction over any state law claims.

20.     Venue is proper in this Court because the events described herein occurred in the Western District of Pennsylvania.

IV)    <u>FACTS</u>

   a. <u>*City Officials were on notice that the PBP could and would indiscriminately use excessive force against peaceful protesters.*</u>

21.     On May 25, 2020 Minneapolis police officers murdered George Floyd, an African-American man, by kneeling on his neck and back until he suffocated. Video of the murder sparked public outrage and weeks of protests against racism and police violence throughout the United States that continue as of the filing of this Complaint.

22.     Numerous protests took place in and around Pittsburgh, Pennsylvania.

23.     On Saturday, May 30, 2020 thousands of concerned residents of the City of Pittsburgh and surrounding areas gathered in Pittsburgh's Downtown area to protest police racism and violence. The vast majority of the attendees did not engage in any property damage or violence. However, following some reports of property damage, PBP officers used chemical gas, rubber bullets and other projectiles, pepper spray, flashbang grenades and other riot control agents indiscriminately against everyone present, including peaceful protesters and nonviolent bystanders.   Numerous protesters were seriously injured. The PBP arrested 46 people at the protests for "failure to disperse." The Allegheny County District Attorney refused to pursue charges against at least 39 of these arrestees because the PBP's evidence was insufficient to support the charges.

24.     As a result of the PBP's actions on May 30, 2020, Defendants Peduto, Hissrich and Schubert were on notice that PBP officers would use overwhelming and excessive force against peaceful protesters with little or no provocation.

7

25.     As a result of the PBP's actions on May 30, 2020, Defendants Peduto, Hissrich and Schubert were on notice that PBP officers would arrest and jail peaceful protesters with little or no evidence to support criminal charges.

26.     Defendants Peduto, Hissrich and Schubert supported the PBP actions.

27.     Defendants Peduto, Hissrich and Schubert made no effort to ensure that such indiscriminate use of force did not occur at future protests.

b.  *PBP used excessive force against peaceful protesters on June 1, 2020*

28.     On June 1, 2020 thousands of concerned Pittsburgh residents again gathered to protest police racism and violence, this time in the East Liberty neighborhood of the City of Pittsburgh.

29.     Plaintiffs were among those protesters who gathered in East Liberty on June 1, 2020.

30.     Plaintiff Nicole Rulli attended the protest with her fiancé Plaintiff Charles Bryant, Jr. and her thirteen-year-old son, A.F. (collectively "Rulli family"). Rulli is Caucasian, Bryant is African-American and A.F. is biracial. Bryant wrote of his decision to attend the protest: "Attending the protest on June 1st was the most patriotic act of my life. I was exercising my 1st amendment rights." Rulli and Bryant brought A.F. to the protest because they wanted to expose him to a peaceful political protest and teach him about his constitutional rights.

31.     Plaintiff Simon Phillips is a dance instructor.  He is African American. Phillips wrote that he attended the protest for "the chance to congregate with others"  and express his "feelings of grief, frustration, and desperation for the Black community."

32.    Plaintiff Donovan Hayden works for a local arts non-profit.  Hayden wrote of his reasons for joining the protest: "The recent killings of Ahmaud Arbery, Breonna Taylor, and George Floyd, reignited the anger that I share with many black people. The anger that comes from being victims to degrading, reckless, and racist policing. I channeled and expressed that anger through protesting on June 1st. I marched, sang, and listened with others to mourn the lives lost and challenge the systems killing us."

33.    Plaintiff Christoper Wilson Juring works in the food service industry.  He participated in the protest in order to exercise his First Amendment rights. Juring wrote the following regarding his reasons for protesting: "On Monday, June 1st, 2020 I attended the Black Lives Matter protest in East Liberty to give my support to the fight against police brutality and systemic racism. I feel that participating in such protests is a necessary step in demanding change. As a white person, I wanted to use my privilege and my voice when so many people can't even walk down the street without fearing for their lives."

34.    Plaintiff Jennifer "Jay" Yoder works for a non-profit that supports survivors of sexual violence. Yoder is a trained international human rights observer and peacemaker and has observed and participated in protests involving international conflict. Jay was at the protest to support racial justice and oppose police brutality, as well to observe police conduct and assist protestors.

35.    The protesters marched peacefully in the streets in the vicinity of Penn Avenue and Centre Avenue from approximately 3:30 pm until approximately 6:30 pm.

36.    Historically, Defendants Peduto, Hissrich, Schubert and City of Pittsburgh have permitted, approved and/or encouraged similar protests in Pittsburgh streets.

37.     Uniformed Pittsburgh Bureau of Police (PBP) officers approved and/or encouraged the protesters' activities by, *inter alia*, marching with them, communicating with organizers, blocking off streets and redirecting traffic.

38.     By attending, approving, encouraging, and assisting the protesters activities, Defendants communicated to them that they were exercising their First Amendment rights in a time, place and manner that Defendants considered reasonable.

39.     At approximately 6:30 pm, the protesters congregated at the Target store located at the Corner of Penn Avenue and Centre Avenue. Many either remained at that location or left the area.

40.     Between 6:30 pm and 7:00 pm, a much smaller group of 100 to 150 protesters continued to march down Centre Avenue toward Negley Avenue (hereinafter "Protesters").

41.     The Protesters marched peacefully down Centre Avenue for over half a mile.

42.     Although Defendant Peduto had implemented a curfew for the City of Pittsburgh, this curfew would not go into effect until 8:30 pm, nearly two hours later.

43.     As the Protesters marched, approximately 50 to 100 PBP officers formed a line across Centre Avenue at Negley Avenue, blocking the Protesters' path.

44.     The officers wore helmets, face shields and gas masks. Every officer held either a baton or a firearm.

45.     Additional officers were dressed in military gear including camouflage, helmets and gas masks.  These officers carried firearms and other tactical gear.  Some

had police dogs. On information and belief, these officers were members of the PBP Special Weapons and Tactics ("SWAT") Team.

46.     At about the same time as the above described PBP officers blocked the Protesters' path on Centre Avenue, other PBP officers and/or law enforcement officers acting under the direction of PBP, formed similar lines across other East Liberty streets.

47.     The Protesters stopped on Centre Avenue approximately 30 feet from the line of police officers.

48.     The Protesters were peaceful.

49.     The Protesters' behavior was not materially different from the behavior of the larger group of protesters earlier in the day, which the PBP openly approved and supported.

50.     Groups of Protesters chanted, "Hands up - Don't Shoot," "This is not a riot," "Join us," and similar phrases. Some Protesters knelt on the ground with their hands in the air. Link to Video 1; Link to Video 2 [2]

51.     The Protesters did not damage public or private property.

52.     The Protesters did not throw bricks or rocks at the PBP officers.

53.     The Protesters did not engage in any activity that could have given rise to a reasonable belief that they were likely to cause substantial harm or serious inconvenience, annoyance or alarm.

54.     The Protesters did not present an imminent threat to public safety, peace or order;

---

[2] All attachments can be viewed at the following link
https://www.dropbox.com/sh/hlnksjtotwpxs0a/AAC7A6p0dbTaMvxTwA8NArzYa?dl=0

55.     Nevertheless, on information and belief, Defendant Doe and/or other individually named Defendants made the decision to declare the Protesters' assembly unlawful and order the Protesters to disperse.

56.     Defendants' Peduto, Hissrich and Schubert were either present during the above-described events or were otherwise aware of them as they occurred.  These three defendants either made the decision to declare the assembly unlawful, or approved of that decision and the basis for that decision.

57.     At approximately 7:17 pm, a PBP officer (possibly Defendant Doe) made the following announcement (hereinafter "unlawful assembly announcement"):

> I am Officer [unintelligible] of the Pittsburgh Police. I hereby declare this to be an unlawful assembly. I order all those assembled at this location to immediately disperse. You must leave this immediate vicinity.  If you remain in this vicinity you are in violation of the Pennsylvania crimes code. No matter what your purpose is you must leave. If you do not disperse you will be arrested and/or subject to other police action. Other police action may include actual physical removal, the use of riot control agents and/or less lethal munitions which could cause the risk of injury for those who remain.  You must immediately leave outbound on Centre Avenue. [Unintelligible]

58.     At that time, Centre Avenue outbound was blocked by numerous police vehicles and/or riot control officers;

59.     Shortly after the first "unlawful assembly announcement" was made, PBP deployed a Long Range Acoustic Device ("LRAD") against the Protesters.  A LRAD is military-grade weapon that emits a "deterrent tone" so loud it can cause permanent hearing loss.

60.     Police warned the Protesters not to "advance" on their line. However, nearly all of the Protesters were at least 30 feet away from the officers. At no time did any Protester "advance" on the officers.

61.     The PBP officer made more "unlawful assembly announcements" over the next several minutes and continued to deploy the LRAD.

62.     An unknown PBP officer discharged a firearm into the crowd hitting a Protester in the knee.  Other Protesters dragged the injured Protester to the sidewalk and offered him assistance.  Link to Video.

63.     Despite this aggressive action by the PBP, the Protesters remained peaceful. They continued chanting but did not disperse. The Protesters did not throw rocks, bricks or bottles. The Protesters did not destroy property or commit acts of violence or vandalism. The Protesters did not advance on the police. Link to Video 1. Link to Video 2.

64.     Despite the lack of any destruction, property damage or violent behavior by the Protesters, on information and belief, Defendant Doe ordered the PBP officers to use force against the Protesters.

65.     The PBP and Defendants made no attempt to communicate to the Protesters why the assembly was declared unlawful.

66.     The PBP and Defendants made no attempt to communicate to the Protesters why they were being ordered to disperse.

67.     In the middle of an unlawful assembly announcement, a PBP police officer suddenly threw a "flashbang" grenade at the crowd.  Link to Video 1; Link to Video 2; Link to Video 3.

68.     A "flashbang" grenade is an explosive device designed to frighten and disorient an enemy through a blinding flash of light and extremely loud explosive noise.

69.     Immediately following the detonation of the flashbang grenade, PBP officers began firing "rubber bullets," "beanbags rounds" and/or "sponge grenades" at the Protesters.  Link to Video.

70.     "Rubber bullets" are large rubber coated metal cylinders which can be fired from standard firearms or dedicated "riot guns."   "Beanbag rounds" are cloth bags filled with lead shot which are fired from a 12-gauge shotgun.   "Sponge grenades" are large plastic or metal bullets with dense foam rubber tips. They are typically fired from a 40mm grenade launcher.

71.     Although these items are often referred to as "less lethal" munitions, they are fired with the force of a gun or grenade launcher and have the capability to cause serious injury and/or death, particularly when fired at close range or when fired at vulnerable areas of the body.

72.     PBP officers also threw and/or shot canisters into the crowd, some of which emitted smoke ("smoke bombs") and some of which emitted chemical gas commonly referred to as "tear gas" ("chemical grenades.")

73.     "Tear gas" generally refers to chemical agents that cause tearing, coughing, difficulty breathing, skin irritation and/or vomiting.  Tear gas grenades can be thrown or fired from a grenade launcher.

74.     Tear gas can cause serious complications for people with respiratory problems.  Exposure to tear gas increases susceptibility to COVID-19 infection and/or complications.

75.     Numerous Protesters were injured by tear gas thrown into the crowd. Link to Video. Many Protesters were coughing, had tears streaming down their faces, and had difficulty breathing and seeing. The tear gas caused some Protesters to vomit.

76.     The explosions, gunfire, smoke and gas caused many of the Protesters to panic and run outbound on Centre Avenue and into nearby side streets. Link to Video.

77.     The PBP officers immediately began to march outbound on Centre Avenue, continuing to indiscriminately shoot rubber bullets, beanbag rounds and/or sponge grenades at the fleeing Protesters as they ran away. Link to Video.

78.      The smoke created from the PBP's smoke bombs and chemical gas grenades was so thick that the officers could not see what or who they were shooting.

79.     Videos show PBP officers shooting blindly into smoke-filled Centre Avenue as Protesters run away. Link to Video 1; Link to Video 2.

80.     Numerous Protesters were hit with rubber bullets, bean bag rounds and sponge grenades.  Some were seriously injured and required hospitalization.

81.     One Protester was hit in the face with an unknown munition and knocked unconscious. He suffered serious injuries and began bleeding profusely. Other Protesters dragged him out of the street and attempted to render medical aid.  Link to Video ; Link to Photograph. As they did so a SWAT officer threw a chemical grenade at them.

82.     No ambulance arrived to treat or transport the protester, so other Protesters eventually drove him to the hospital where, on information and belief, he was treated for multiple facial fractures.

83.     The marching PBP officers were flanked on the sidewalks by PBP SWAT officers who pointed their firearms at Protesters, shoved them and yelled at them. Link to Video.

84.     As the PBP officers advanced, they continued to deploy chemical gas grenades, sometimes throwing them at Protesters as they fled.

85.     PBP officers deployed oleoresin capsicum ("OC" or "pepper") spray on fleeing and/or peaceful Protesters.

86.     Multiple video recordings from the scene show two Protesters in an alley as the line of PBP officers approaches.  The Protesters are on their knees with their hands in the air.  An officer sprays an unknown substance, believed to be OC spray, into the Protesters' faces multiple times from a distance of approximately five feet, causing them to run.  A SWAT officer then throws a cannister, believed to be a chemical gas grenade, at the fleeing Protesters as another officer shoots an unknown munition at them. Link to Video 1; Link to Video 2.

87.     As the PBP officers advanced, they knowingly shot at peaceful Protesters from dangerously close range.

88.     Multiple video recordings from the scene depict a line of officers advancing on three Protesters (two men and a woman).  The Protesters slowly walk backwards with their hands raised.  A SWAT officer shoots the female protester in the chest with an unknown munition from a distance of approximately 10 feet. Link to Video 1 ; Link to Video 2.

89.     The PBP used advancing lines of officers and chemical gas to cut off avenues of escape for fleeing Protesters.  As a result, Protesters were forced to choose between approaching a line of officers or retreating into clouds of chemical gas.

90.     PBP officers arrested trapped Protesters and falsely charged them with failure to disperse and disorderly conduct.

91.     PBP officers shot and threw chemical gas canisters at trapped Protesters.

92.     PBP officers continued to deploy chemical gas and other munitions on Protesters, bystanders and passers-by throughout East Liberty long after the Protesters had dispersed and over a half mile away from where the Protesters had initially assembled. Link to Video 1 ; Link to video 2  Link to Video 3;  Link to Video 4.

93.     PBP arrested and criminally charged 22 people on June 1 in relation to the protest.

94.     Despite a lack of probable cause for these arrests, the PBP transported the 22 arrestees to the Allegheny County Jail where they were confined for hours in close quarters, in an area known to cause an increased risk of contracting COVID-19.

95.     On June 18, the Allegheny County District Attorney's Office withdrew charges against all 22 people arrested and charged by PBP due to a lack of evidence.[3]

c. _PBP prevented injured Protesters from receiving medical treatment_

96.     At all times relevant, at least one ambulance was at the scene and was escorted by an armored SWAT vehicle. This ambulance was not used to provide medical treatment or transportation to injured Protesters. On information and belief, this ambulance was requested by the PBP and was reserved to treat PBP personnel.

---

[3] https://triblive.com/local/pittsburgh-allegheny/charged-dropped-for-22-protesters-arrested-in-east-liberty-melee/

97.    On information and belief, the PBP made no effort to ensure that EMTs or other trained medical professionals were available to treat injured Protesters, despite knowing that the level of force they planned to use against Protesters was likely to cause serious injury or death.

98.    On information and belief, PBP officers prevented EMTs from entering the area and treating injured Protesters.

99.    Because the PBP did not ensure that EMTs were available to treat Protesters and/or prevented EMTs from treating Protesters, injured Protesters received medical assistance by untrained and unqualified individuals and were transported to the hospital in cars and pickup trucks.

   d. _Plaintiffs Nicole Rulli, Charles Bryant, Jr. and A.F. (the "Rulli family")_

100.    The Rulli family left for the protest when Rulli got home from work.  They arrived at the corner of Centre Avenue and Penn Avenue at approximately 6:15.

101.    The Rulli family joined the Protesters as they marched down Centre Avenue;

102.    The Rulli family did not participate in any vandalism, violence or destruction, nor did they witness any vandalism, violence or destruction before the PBP used force against the Protesters.

103.    The Rulli family did not throw any objects at PBP officers, nor did they witness anyone else throwing objects at PBP officers before the PBP used force against the Protesters.

104.    The Rulli family did not disperse when ordered to do so because the Protesters were peaceful and they believed they had a First Amendment right to protest police misconduct in that place, at that time and in that manner.

105.    After the PBP officers began shooting at them and gassing them, the Rulli family ran outbound on Centre Avenue as directed by the unlawful assembly announcement.

106.    The Rulli family found that Centre Avenue outbound was blocked by PBP police in riot gear. Link to Photograph.

107.    All of the side streets leading off of Centre Avenue were similarly blocked.

108.    Unable to escape, the Rulli family ran to the top of a parking structure/shopping center along Centre Avenue at Beatty Street.

109.    From the top of the parking garage they witnessed a Protester on a side street below who was bleeding profusely from the head.  Several Protesters were surrounding the injured individual and attempting to render medical aid.  No PBP officers or City of Pittsburgh EMTs assisted. Link to Video. As the Rulli family watched, a PBP officer threw a chemical grenade at the injured Protester and those trying to assist him.

110.    Eventually the PBP officers advanced far enough down Centre Avenue that the Rulli family was able to exit the parking structure behind them and walk down the sidewalk on Centre Avenue toward their car, which was parked near the Target store.

111.    As the Rulli family walked down Centre Avenue toward its intersection with Penn Avenue, an armored vehicle full of SWAT officers stopped in the middle of the street. The armored vehicle was followed by a City of Pittsburgh ambulance and several other PBP vehicles.

112.    The corner of Penn and Centre is well over a half mile from the location where the Protesters had gathered.

113.    Several SWAT Officers exited the armored vehicle. Without warning, one of these SWAT officers threw a chemical gas grenade at the Rulli family.  Link to Video.

114.    The grenade hit Rulli's foot and immediately began spewing gas in her face; SWAT officers threw two more chemical gas grenades at the family.

115.    Rulli yelled to thirteen-year-old A.F., telling him to run as she collapsed, unable to breathe and in excruciating pain.

116.    Bryant, who suffers from asthma, was similarly disabled by the chemical gas the PBP officer had thrown at them.

117.    The ambulance which followed the armored tactical vehicle did not assist Rulli or Bryant.

118.    A group of Protesters attempted to render aide to Rulli and Bryant.

119.    A legal observer called 9-1-1 and requested an ambulance.  She informed the operator that Mr. Bryant suffered from asthma and had been tear gassed.

120.    Rulli and Bryant waited for approximately a half hour. No ambulance arrived to treat them.

121.    Bryant began searching for A.F.  He asked a PBP officer if he had seen a thirteen-year-old boy without his parents.  The PBP officer dismissively told him, "That's on you."

122.    Upon being told by his mother to run, thirteen-year-old A.F. had run to the parking lot of the Giant Eagle grocery store located near Penn Avenue and Shady

Avenue.  He was disoriented from the effects of the chemical gas and his phone battery was dead, so he was unable to call Rulli or Bryant.

123.    A group of strangers found A.F. and attempted to clean the chemicals out of his eyes. One of them lent him a phone to call Rulli and Bryant.  These strangers stayed with A.F. until Rulli and Bryant were able to get him.

124.    As a direct and proximate result of PBP's actions, A.F. has become fearful of police officers.

125.    As a direct and proximate result of PBP's actions, A.F. has become fearful of being separated from his parents.

126.    As a direct and proximate result of the PBP's actions, A.F. has become fearful of protests.

127.    A.F.'s fears, particularly his fear of protests, has caused the Rulli family to avoid attending protest events which they would otherwise have attended.

128.    As a direct and proximate result of PBP's actions, Rulli, Bryant and A.F. have suffered physical and emotional injuries.

    e. _Plaintiff Simon Phillips_

129.    Plaintiff Simon Phillips participated in the protest and march which began at 3:30 at the Target store at the corner of Centre Avenue and Penn Avenue. Phillips left the protest at 5:00 pm to teach a dance class.

130.    Phillips returned to the protest at approximately 6:30 pm and marched down Centre Avenue with the Protesters.

131.   Phillips did not participate in any vandalism, violence or destruction, nor did he witness any vandalism, violence or destruction before the PBP used force against the Protesters.

132.   Phillips did not throw any objects at PBP officers, nor did he witness anyone else throwing objects at PBP officers before the PBP used force against the Protesters.

133.   After the PBP made the first unlawful assembly announcement and before PBP officers began using force against the Protesters, Phillips left the area and tried to return to his apartment.

134.   Phillips' apartment is over a half mile from the Corner of Centre Avenue and Negley Avenue.

135.   When Phillips was approximately 200 yards from his apartment, an armored vehicle drove up behind him and several SWAT officers jumped out brandishing firearms.

136.   Another line of SWAT officers approached him from the other direction, trapping him.

137.   Two women were also trapped by the encroaching SWAT officers.

138.   The SWAT team ordered Phillips and the women to put their hands up and drop to the ground, which they did.

139.   The SWAT officers bound their hands with zip ties and dragged them to the curb.

140.   The SWAT officers would not tell them why they were being arrested.

141.   As Phillips was being detained, PBP officers approached, tackled and forcibly arrested a woman as she complained about the arrests. The PBP officers then threw a grenade that contained either smoke or chemical gas at onlookers who questioned the officers' actions and/or attempted to videotape them. Link to Video.

142.    An hour and a half after he was taken into custody, the officers lifted Phillips to put in him a police vehicle.  There was a pool of blood on the ground where he had been sitting. The zip ties had lacerated Phillips' left wrist.

143.    PBP officers transported Phillips to the hospital where he received multiple stitches in his left wrist. Link to Photograph. Phillips did not believe he needed stitches and requested not to get them. PBP officers told him he could not be jailed at the Allegheny County Jail without them. Phillips later received a bill from the University of Pittsburgh Medical Center for $868.

144.    PBP officers remained with Phillips while he was in the hospital and transported Phillips from the hospital to the Allegheny County Jail, where he was detained overnight.

145.    Phillips was charged with disorderly conduct and failure to disperse.

146.    The officers who arrested Phillips had no probable cause to believe that he had committed the crimes of disorderly conduct or failure to disperse.

147.    All of the charges against Phillips were withdrawn prior to his preliminary hearing due to a lack of evidence.

148.    As a direct and proximate result of the conduct of the PBP, Phillips suffered physical and emotional injury.

f.   _Plaintiff Jay Yoder_

149.    Plaintiff Jay Yoder attended the June 1, 2020 protest to participate in the protest, document the event and assist injured Protesters as needed.

150.   Yoder did not participate in any vandalism, violence or destruction, nor did they witness any vandalism, violence or destruction before the PBP used force against the Protesters.

151.   Yoder did not throw any objects at PBP officers, nor did they witness anyone else throwing objects at PBP officers before the PBP used force against the Protesters.

152.   Yoder did not leave when ordered to do so by the PBP because they believed they had a constitutionally protected right to continue to protest, as well as to document the PBP's actions and assist Protesters.

153.   Soon after PBP officers began shooting and gassing the Protesters, Yoder, who was on the sidewalk, began to retreat;

154.   Because of a disability, Yoder was unable to move fast enough to satisfy the officers. PBP SWAT officers yelled at and pushed Yoder.  Link to Video.

155.   Chemical gas burned Yoder's eyes, nose, throat and skin.

156.   The PBP fired munitions including rubber bullets, bean bag rounds and sponge grenades at Yoder.

157.   Yoder witnessed a SWAT officer shoot a female protester in the chest with an unknown munition which Yoder believed to be a tear gas grenade from a distance of approximately 10 feet. Link to Video.

158.   After the Protesters dispersed, Yoder attempted to leave the scene but was blocked by PBP officers.

159.   Yoder stated repeatedly to the officers, "My car is over there," and "I'm just trying to get to my car."

160.    Nevertheless, PBP officers ordered Yoder to the ground, arrested and falsely charged them with failure to disperse and disorderly conduct.  Link to Video.

161.    PBP officers transported Yoder to Allegheny County Jail where they were detained overnight.

162.    PBP officers did not have probable cause to believe that Yoder had committed the crimes of failure to disperse or disorderly conduct.

163.    All of the charges against Yoder were withdrawn prior to their preliminary hearing.

164.    As a direct and proximate result of PBP's use of chemical gas against Yoder, Yoder is at increased risk of contracting and/or suffering complications from COVID-19.

165.    As the direct and proximate result of Defendants' actions, Yoder suffered physical injuries and emotional distress.

### g.   *Plaintiff Donovan Hayden*

166.    Plaintiff Donovan Hayden participated in the march which took place from approximately 3:30 pm to 6:30 pm and joined the smaller group of Protesters who continued marching down Centre Avenue.

167.    Hayden did not participate in any vandalism, violence or destruction, nor did he witness any vandalism, violence or destruction before the PBP used force against the Protesters.

168.    Hayden did not throw any objects at PBP officers, nor did he witness anyone else throwing objects at PBP officers before the PBP used force against the Protesters.

169.    Hayden did not leave when ordered to do so by the PBP because he believed he had a First Amendment right to peacefully protest and the order to disperse violated the Constitution.

170.    Chemical gas burned Hayden's eyes, nose, throat and skin and Hayden nearly vomited from the effects of the gas.

171.    As a result of PBP's use of chemical gas against Hayden, Hayden is at increased risk of contracting and/or suffering complications from COVID-19.

172.    As a result of PBP's actions, Hayden suffered physical injuries and emotional distress.

> h. _Plaintiff Christopher Wilson Juring_

173.    Plaintiff Christopher Wilson Juring participated in the march which took place from 3:30 pm to 6:30 pm and then joined the smaller group of Protesters who marched down Centre Avenue at approximately 6:30.

174.    Juring did not did not participate in any vandalism, violence or destruction, nor did he witness any vandalism, violence or destruction before the PBP used force against the Protesters.

175.    Juring did not throw any objects at PBP officers, nor did he witness anyone else throwing objects at PBP officers before the PBP used force against the Protesters.

176.    Juring did not leave when ordered to do so by the PBP because he believed he had a First Amendment right to peacefully protest and the order to disperse violated the Constitution.

177.    When police began to fire munitions and tear gas into the crowd, Juring ran outbound on Centre Avenue in an attempt to leave the area.

26

178.    The PBP struck Juring with four rubber bullets in his lower back and the backs of his legs as he ran away.   Link to Photograph 1; Link to Photograph 2; Link to Photograph 3.   Link to Photograph 4.

179.    Chemical gas burned Juring's eyes, nose, throat and skin.

180.    As a result of PBP's use of chemical gas against Juring, Juring is at increased risk of contracting and/or suffering complications from COVID-19.

181.    As a result of PBP's actions, Juring suffered physical injuries and emotional distress.

    i.   *City of Pittsburgh Officials falsely accused the Protesters of misconduct and minimized the PBP's use of force*

182.    At 11:00 on the evening of June 1, 2020 Individual Defendants Peduto, Hissrich, Schubert, Vinansky, Lando and Doe (hereinafter "Individual Defendants") held a press conference. Link to Transcript.

183.    At the press conference defendants Peduto, Hissrich and Schubert praised the actions of the PBP toward the Protesters in East Liberty that evening.

184.    Defendant Hissrich Stated:

> And I just want to mention that the work that was done by the officers . . . tonight should be commended . . . I think we prevented businesses from being looted and possibly set afire. So I just want to commend all the public safety, the different law enforcement agencies that were out there tonight, and I think the public, they should be thanking the police officers for the work that they have done.

185.    Defendant Schubert stated:

> I give a lot of credit to the officers who were there because I watched them. They did an incredible job. They did an incredible job trying to keep the public safe while they were out there.

186.    Defendant Peduto Stated:

> . . . it was then that the officers escalated to the point of being able to break the crowd up, and that finally succeeded. What we did not see is East Liberty is not on fire tonight. People from East Liberty are not harmed. Two protestors were taken for evaluation, and they should be absolutely fine. Nine officers were hurt by protestors.

187.    In order to justify the PBP's unwarranted violence against peaceful Protesters, Individual Defendants falsely accused the Protesters of misconduct and wrongdoing. These false accusations included:

    i.    that Protesters vandalized buildings and broke glass windows;

    ii.    that Protesters engaged in acts of violence and destruction;

    iii.    that Protesters attacked a KDKA television news crew;

    iv.    that Protesters attacked Defendant Vinansky in his police vehicle.

    v.    that Protesters were trying to or intended to "burn East Liberty down;"

    vi.    that Protesters were "only there to cause damage and to try to hurt police officers."

    vii.    that the PBP's use of force was precipitated by Protesters throwing rocks, bricks and water bottles at police officers;

    viii.    that Protesters injured nine PBP officers by throwing rocks and bricks at their heads, chests, pelvis areas, knees and shoulders;

    ix.    that PBP used force against the Protesters only after the Protesters threw multiple "volleys of bricks" at officers;

188.    Following the protests, Individual Defendants also attempted to minimize the level of force PBP used by falsely claiming that:

    i.    the only force PBP used against the Protesters was "smoke;"

    ii.    PBP did not use chemical gas against Protesters;

28

     iii.   PBP did not use, "crowd munitions" against Protesters

     iv.   PBP did not use "rubber bullets" against Protesters;

     v.   Only two protesters were injured by PBP use of force;

     vi.   no Protesters were seriously injured by PBP use of force;

     vii.   City of Pittsburgh personnel treated all injured Protesters at the scene and transported them to hospitals.

   *j.   Defendants' prior tolerance of more threatening protestors demonstrates that Defendants did not reasonably believe Protestors posed a threat to public safety, peace or order*

189.   On April 20, 2020 protesters congregated on Grant Street in Downtown Pittsburgh to protest Governor Tom Wolf's decision to close businesses due to the COVID-19 pandemic.

190.   Many of the April 20 protesters openly carried tactical rifles and wore paramilitary outfits.  A group of these protesters referred to themselves as "The Iron City Response Guard." When asked by a reporter why they had armed themselves in this manner for a peaceful protest, one belligerently responded, "Why not?"

191.   The June 1, 2020 Protesters were not carrying tactical rifles, or any other firearms.  The June 1, protesters were not dressed in paramilitary outfits.

192.   The unarmed and peaceful June 1, 2020 Protesters posed less of a threat of "substantial harm or serious inconvenience, annoyance or alarm" to the residents of the City of Pittsburgh than the heavily armed April 20 protesters.

193.   On information and belief, the PBP did not deploy SWAT units, armored vehicles, riot police and/or snipers to the April 20 protests.

194.   The PBP did not declare the April 20 protests to be unlawful, order the protesters to disperse and/or use force to disperse them.

k. *<u>City of Pittsburgh Officials were aware of, acquiesced in and/or failed to intervene to prevent the violation of the Protesters' rights.</u>*

195.    Individual Defendants witnessed or were otherwise aware of the events described herein as they unfolded.

196.    Individual Defendants were aware that the Protesters were peaceful and were engaged in constitutionally protected speech.

197.    Individual Defendants did not have a reasonable expectation that the Protesters would cause substantial harm or serious inconvenience, annoyance or alarm;

198.    Individual defendants did not have reason to believe that the Protesters presented an imminent threat to public safety, peace or order;

199.    Individual Defendants ordered, authorized and/or acquiesced in the order to declare the assembly unlawful;

200.    Individual Defendants ordered, authorized and/or acquiesced in the use of excessive force against Protesters;

201.    Individual Defendants had the opportunity to intervene to prevent the violation of the Protesters' constitutionally protected rights and failed or refused to do so;

l. *The decision to use force constituted the official policy of the City of Pittsburgh*

202.    Defendants Peduto, Hissrich and Schubert, jointly and/or individually, possessed final policymaking authority to make the decision to 1) declare Protesters' assembly unlawful, 2) use force to disperse Protesters and 3) use noxious chemical gas and extremely dangerous and painful rubber bullets, beanbag rounds and/or sponge grenades against Protesters.

203.   Peduto, Hissrich and Schubert jointly and/or individually made, approved and/or acquiesced in these decisions to violate Protesters' constitutional rights.

204.   The violation of Protesters' rights was the direct result of the official policy of the City of Pittsburgh.

*m.   PBP violated its policy regarding discharge of less lethal munitions*

205.   PBP's policy regarding discharge of less lethal munitions does not provide for the use of rubber bullets or sponge grenades. Nevertheless, PBP officers shot Protesters with rubber bullets and sponge grenades.

206.   PBP's Policy regarding discharge of less lethal munitions does not permit discharge from less than 20 feet. Nevertheless, officers discharged rubber bullets, beanbags and/or sponge grenades at Protesters from a distance of far less than 20 feet.

207.   PBP policy recognizes that, "The use of kinetic energy impact projectiles are considered deadly force, if intentionally deployed to areas of the subjects [sic] body that are recognized as likely to cause serious bodily injury or death (head, neck, throat, chest or solar plexus)."  PBP policy prohibits officers from targeting these areas of a person's body unless deadly force is justified.  Nevertheless, PBP officers fired hundreds of rubber bullets, beanbags and/or sponge grenades indiscriminately into clouds of smoke, through which they could not see the Protesters' bodies.  As a result, Protesters were hit with projectiles in areas of their bodies likely to cause serious bodily injury and were, in fact, seriously injured.

208.   PBP policy requires officers to transport persons subject to kinetic energy impact projectiles to a medical facility for evaluation and treatment.  PBP did not transport Protesters injured by rubber bullets and bean bags to medical facilities, or render any

medical aid whatsoever, even though an ambulance accompanied police vehicles. PBP did not pre-arrange for medical care or transportation for injured Protesters, even though it intended to use levels of force which were likely to cause serious injury or death to Protesters.

209.   PBP's failure to follow its own policy regarding discharge of less lethal munitions constituted deliberate indifference to the rights of Plaintiffs.

n.   *PBP failed to adopt necessary policies and procedures regarding crowd control*

210.   The PBP does not have a policy governing the declaration of assemblies as "unlawful" and the forced dispersal of protests, even though the need for such a policy is obvious.

211.   The PBP does not have a policy governing the use of chemical gas, flashbang grenades and/or smoke bombs even though the need for such a policy is obvious.

212.   PBP's failure to adopt these policies constituted deliberate indifference to the constitutional rights of Plaintiffs and other peaceful Protesters with whom PBP officers come into contact.

o.   *PBP's failed to properly train officers regarding crowd control*

213.   PBP's use of force training curriculum does not address, or does not properly address, crowd/riot control techniques, use of impact munitions, chemical gas, flashbang grenades and/or smoke bombs.

214.   PBP does not train, or does not properly train, officers in crowd/riot control techniques;

215.   PBP does not train, or does not properly train, officers in the use of munitions such as rubber bullets, bean bag rounds and/or sponge grenades.

216.   PBP does not train, or does not properly train, officers in the use of chemicals, such as "tear gas" and/or OC spray for crowd control purposes.

217.   PBP does not train, or does not properly train, officers in the use of flashbang devices and/or smoke bombs for crowd control purposes.

218.   PBP's failure to train its officers, as hereinbefore described, constituted deliberate indifference to the rights of Plaintiffs and other peaceful protesters with whom PBP officers come into contact.

V)     CLASS ALLEGATIONS

219.   Plaintiffs bring this action as a class action pursuant to Rule 26 of the Federal Rules of Civil Procedure;

220.   Plaintiffs seek to represent a primary class and two subclasses.

221.   The proposed primary class consists of the following:

> Every individual who was present at or near the intersection of Centre Avenue and Negley Avenue in the City of Pittsburgh on June 1, 2020 for the purpose of engaging in lawful protest and who was ordered to disperse by the City of Pittsburgh Bureau of Police.

222.   The first proposed subclass (Subclass A) consists of the following:

> Every member of the primary class who was subjected to force by City of Pittsburgh Bureau of Police Officers, or law enforcement officers acting under the direction of the City of Pittsburgh Bureau of Police.

223.   The second proposed subclass (Subclass B) consists of the following:

> Every member of the primary class who was arrested and/or who was criminally charged with disorderly conduct and/or

> failure to disperse by City of Pittsburgh Bureau of Police
> officers or other officers acting under the direction of the City
> of Pittsburgh Bureau of Police.

224.    The requirements of Fed. R. Civ. Pro. 23(a)(1) are satisfied with regard to classes and subclasses in that Plaintiff estimates that there are at least 100 class members in the primary class and subclass A, and at least 22 class members of subclass B, whose interests would be affected by any order of declaratory or injunctive relief.  The number of class members is so large that joinder of all its members is impracticable.

225.    The requirements of Fed. R. Civ. Pro. 23(a)(2)  are satisfied in that there are questions of law and fact common to the classes, including but not limited to:

   i.   Whether the Defendants violated the First Amendment to the United States Constitution when they declared the Protesters peaceful assembly "unlawful" and ordered Protesters to disperse?

   ii.  Whether the Defendants violated the First Amendment to the United States Constitution when they used force to disperse Protesters who were peaceably assembled?

   iii. Whether the Defendants violated the Fourth Amendment to the United States Constitution when they used force to disperse Protesters who were peaceably assembled?

   iv.  Whether the Defendants violated the Fourth and/or Fourteenth Amendment to the United States Constitution by using unnecessary and excessive force to disperse Protesters who were peaceably assembled?

   v.   Whether the Defendants violated the Fourth and/or 14th Amendments to the United States Constitution by failing to adequately train, supervise, regulate PBP officers, including failure to promulgate necessary policies, in responding to individuals exercising constitutionally protected rights to protest and/or assemble.

34

226.    The requirements of Fed. R. Civ. Pro. 23(a)(3) are satisfied in that Plaintiffs' claims are typical of the claims of the class.  Plaintiff and all class members are seeking injunctive relief and damages under federal law. Any finding that that Defendants' conduct violated Plaintiffs' rights will be applicable to all class members.

227.    The requirements of Fed. R. Civ. Pro. 23(a)(4)  are satisfied in that Plaintiffs' attorneys, Margaret S. Coleman, Esq., and the Law Offices of Timothy P. O'Brien, and Quinn Cozzens and the Abolitionist Law Center will fairly and adequately represent the interests of the class in that:  (i) they have done significant work in identifying and investigating potential claims prior to filing this action; (ii) they and their respective firms have extensive experience litigating class actions, other complex litigation and the types of claims asserted in the Class Action Complaint; (iii) they have extensive knowledge of the applicable law; and (iv) they are advancing the costs of the litigation.

228.    The requirements of Fed. R. Civ. Pro. 23(b)(1) are satisfied in that prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; and/or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

229.    The requirements of Fed. R. Civ. Pro. 23(b)(2) are satisfied in that the parties opposing the class have acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

VI)    <u>CLAIMS</u>

<u>COUNT I</u>

<u>Named Plaintiffs and Primary Class Members v. Individual Defendants</u>

<u>Violation of the First Amendment of the United States Constitution</u>

230.    Defendants' actions, as outlined above, violated Plaintiffs' and Primary Class Members First Amendment Rights to freedom of speech, freedom to peaceably assemble and freedom to petition the government for redress of grievances.

231.    Defendants' actions, as outlined above, were not reasonable regulations of the time, place or manner of Plaintiffs' speech.

232.    Defendants' actions, as outlined above had the purpose and effect of suppressing Plaintiffs' speech and dissuading Plaintiffs and others from engaging in future activities protected by the First Amendment;

233.    Defendants' actions, as outlined above, would reasonably be expected to deter a reasonable person from exercising their First Amendment rights.

234.    As a direct and proximate result of Defendants' conduct, as outlined above, Plaintiffs and Primary Class Members suffered physical injury and/or emotional and psychological pain and suffering.

<u>COUNT II</u>

<u>Named Plaintiffs and Subclass A Members v. Individual Defendants</u>

<u>Violation of the Fourth Amendment to the United States Constitution</u>

<u>Excessive Force</u>

235.    Defendants' actions, as outlined above, violated Plaintiffs' and Subclass A Members' Fourth Amendment right to be free from the use of excessive force.

236.    As a direct and proximate result of Defendants' conduct, as outlined above, Plaintiffs and Primary Class Members suffered physical injury and/or emotional and psychological pain and suffering.

## COUNT III

Phillips, Yoder and Subclass B Members v. Individual Defendants

Violation of the Fourth Amendment to the United States Constitution

Unlawful Arrest

237.    Defendants' actions, as outlined above subjected Phillips, Yoder and Subclass B Members to an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

238.    As a direct and proximate result of Defendants' conduct, as outlined above, Phillips, Yoder and Subclass B Members suffered physical injury and/or emotional and psychological pain and suffering.

## COUNT IV

Phillips, Yoder and Subclass B Members v. Individual Defendants

Violation of the First Amendment to the United States Constitution

Retaliatory Prosecution

239.    Defendants' actions, as outlined above subjected Phillips and Yoder and Subclass B members to malicious prosecution in retaliation for engaging in Constitutionally protected speech in violation of the First Amendment to the United States Constitution.

240.    As a direct and proximate result of Defendants' conduct, as outlined above, Phillips, Yoder and Subclass B Members suffered physical injury and/or emotional and psychological pain and suffering.

## COUNT V

### Named Plaintiffs and Primary Class Members v. City of Pittsburgh

### Violation of the First and/or Fourteenth Amendment to the United States Constitution

241.    Defendant City of Pittsburgh's conduct, as hereinbefore described, was the direct and proximate cause of violations of Plaintiffs' First  Amendment Rights to freedom of speech and freedom to peaceably assemble.

242.    As a direct and proximate result of Defendant's conduct, as outlined above, Plaintiffs and Primary Class Members suffered physical injury and/or emotional and psychological pain and suffering.

## COUNT VI

### Named Plaintiffs and Subclass A Members v. City of Pittsburgh

### Violation of the Fourth and/or Fourteenth Amendment to the United States Constitution

### Excessive Force

243.    Defendant City of Pittsburgh's conduct, as hereinbefore described, was the direct and proximate cause of violations Plaintiffs' and Subclass A Members' Fourth Amendment Rights to freedom from excessive force.

244.    As a direct and proximate result of Defendant's conduct, as outlined above, Plaintiffs and Subclass A Members suffered physical injury and/or emotional and psychological pain and suffering.

245.

<u>COUNT VII</u>

<u>Named Plaintiffs and Subclass A Members v. City of Pittsburgh</u>

<u>Violation of the Fourth and/or Fourteenth Amendment to the United States Constitution</u>

<u>Unlawful Arrest</u>

246.    Defendant City of Pittsburgh's conduct, as hereinbefore described, was the direct and proximate cause of violations Plaintiffs' and Subclass B Members' Fourth Amendment Rights to freedom from false arrest and malicious prosecution.

247.    As a direct and proximate result of Defendants' conduct, as outlined above, Plaintiffs and Subclass B Members suffered physical injury and/or emotional and psychological pain and suffering.

VII)   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)   Certify pursuant to Fed R. Civ. Pro. 23 a class of every individual who was present at or near the intersection of Centre Avenue and Negley Avenue in the City of Pittsburgh on June 1, 2020 for the purpose of engaging in peaceful protest and who was ordered to disperse by the City of Pittsburgh Bureau of Police.

(b)   Certify pursuant to Fed R. Civ. Pro. 23 a subclass of every member of the primary class who was subjected to force by City of Pittsburgh Bureau of Police Officers, or law enforcement officers acting under the direction of the City of Pittsburgh Bureau of Police.

(c)   Certify pursuant to Fed R. Civ. Pro. 23 a subclass of every member of the primary class who was arrested and/or who was criminally charged with

failure to disperse by City of Pittsburgh Bureau of Police officers, or law enforcement officers acting under the direction of the City of Pittsburgh Bureau of Police.

(d)   Award declaratory and injunctive relief in favor of Plaintiffs and the Class and against Defendants. Specifically, Plaintiffs request that the Court enter an order specifying that:

   i.   City of Pittsburgh Bureau of Police officers shall not discharge rubber bullets, beanbag rounds, sponge grenades or similar munitions against protesters not engaged in acts of violence toward other people or deploy such munitions indiscriminately such that protesters not engaged in acts of violence toward other people are likely to be injured thereby;

   ii.   City of Pittsburgh Bureau of Police officers shall not deploy rubber bullets, beanbag rounds, sponge grenades or similar "less lethal munitions" under circumstances where the officers cannot see the individuals at whom they are shooting;

   iii.   City of Pittsburgh Bureau of Police officers shall not order protesters to disperse unless the attendees present an imminent threat to public safety, peace or order.

   iv.   The City of Pittsburgh Bureau of Police shall not order protesters to disperse without providing a safe means of egress;

   v.   City of Pittsburgh Bureau of Police officers shall not use chemical agents to disperse any protest unless the attendees present an imminent threat to public safety, peace or order.

(e)   Award to Plaintiffs and the Class punitive damages against the Individual Defendants.

(f)   Award to Plaintiffs and the Class compensatory damages,  attorneys' fees and costs against All Defendants, and

(g)   Award such other relief as this Court deems necessary and proper.

Respectfully submitted,

THE LAW OFFICES OF TIMOTHY P. O'BRIEN

/s/ Margaret S. Coleman
Margaret S. Coleman
Pa. ID No. 200975
msc@obrienlawpgh.com

535 Smithfield Street, Suite 1025
Pittsburgh, PA  15222
(412) 232-4400

and

ABOLITIONIST LAW CENTER

/s/ Quinn Cozzens
Quinn Cozzens
Staff Attorney
PA I.D. No. 323353
qcozzens@alcenter.org

/s/ Bret Grote
Bret Grote
Legal Director
PA I.D. No. 317273
bretgrote@abolitionistlawcenter.org

/s/ Jamelia N. Morgan
Jamelia N. Morgan, of counsel[4]
NY I.D. No. 5351176

Abolitionist Law Center
PO Box 8654
Pittsburgh, PA 15221
717-419-6583

ELZER LAW FIRM, LLC

/s/ Christine T. Elzer
Christine T. Elzer
Pa. I.D. No. 208157

100 First Avenue, Suite 1010

---

[4] Motion for Admission Pro Hac Vice forthcoming

Pittsburgh, PA 15222
(412) 230-8436